# ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ASHANTI GOLDFIELDS SECURITIES LITIGATION | CV 00-0717 (DGT) (RML)<br><br>THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT<br><br><u>Plaintiffs Demand A Trial By Jury</u> |

## NATURE OF THE ACTION

1.     This is a class action on behalf of a class (the "Class") of all persons who purchased or otherwise acquired the Global Depositary Shares ("shares") of Ashanti Goldfields Company Limited ("Ashanti" or the "Company") between April 21, 1997, and October 5, 1999 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act").

## JURISDICTION AND VENUE

2.     Plaintiffs bring this action pursuant to the 1934 Act as amended (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the 1934 Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this District pursuant to § 27 of the 1934 Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) and (c).

5.     In connection with the acts, conduct and other wrongs complained of herein, the defendants used the means and instrumentalities of interstate commerce.

## THE PARTIES

6.     Lead Plaintiffs Ron Moore, Rosemary Valente, William Webster and plaintiff Jayne Furman purchased Ashanti shares during the Class Period, as set forth in the certifications previously filed with the Court and incorporated herein by reference.  These plaintiffs and

members of the plaintiff Class as defined below have suffered substantial damages as a result of the wrongful acts of defendants as alleged herein.

7.    Defendant Ashanti is a foreign corporation organized under the laws of the Republic of Ghana. Ashanti operates four gold mines in Africa and describes itself as the "largest producer of gold in Africa outside of the Republic of South Africa."

8.    Defendant Ashanti is subject to personal jurisdiction with this district by virtue of its sale of public securities within the United States.

9.    Defendant Ashanti and the individual defendants are subject to personal jurisdiction within the United States by virtue of their securing Ashanti's listing on the New York Stock Exchange ("NYSE"), by approving and/or signing the false filings with the Securities and Exchange Commission ("SEC"), by reviewing and/or writing allegedly false press releases and by promoting the Company to investors and analysts in the United States

10.    The individual defendants (the "Individual Defendants"), at all times relevant to this action, served in the capacities listed below and received substantial compensation:

| Name | Position(s) |
|------|-------------|
| Mark B. Keatley | Chief Financial Officer<br>Member, Board of Directors<br>Chairman, Strategic Planning Committee |
| Sam Jonah | Chief Executive Officer<br>Member, Board of Directors<br>Chairman, Finance Committee |

11.    By reason of their management positions and their ability to make and making of public statements in the name of Ashanti, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) Ashanti to engage in the unlawful conduct complained of herein.

## SUBSTANTIVE ALLEGATIONS

12.     The Class Period commences on April 21, 1997.  On or about that date, the

Company filed with the SEC, a Form 20-F for the fiscal period ending December 31, 1996 (the

"1996 20-F").  In Ashanti's 1996 20-F and in its statements throughout the Class Period,

defendants made materially false and misleading statements about Ashanti's purported "hedge"

book of derivatives transactions, falsely stating that the "hedge" book was designed to insulate

and did insulate Ashanti from volatility in the price of gold, whereas in fact the "hedge" book

materially increased Ashanti's exposure to gold price volatility such that the "hedge" book was

in fact a "reckless" bet on future movements in the price of gold, which bet was of such enormity

that it would subject Ashanti to margin calls that would greatly exceed its available cash.

Undisclosed to investors, through the purported "hedge" book, Ashanti had converted itself from

a gold mining company into a financial entity that was speculating recklessly on future gold

price volatility.

13.     The 1996 20-F falsely stated that the Company was "primarily engaged in the

mining and processing of gold ores and the exploration and development of gold properties in

Africa."  The 1996 20-F further falsely stated that the Company was engaged in derivatives

trading to insulate it from fluctuations in the price of gold, and thus "[p]rotect the Company's

cashflow."  Specifically, the 1996 20-F falsely represented:

> The Company pursues a hedging strategy designed both to protect
> the Company's cashflow and ensure its continued ability to
> conduct its business and service its obligations in the event that the
> gold price falls and to allow the Company to participate in upward
> appreciation or any rallies in the gold price.  The overall sales and
> hedging strategy is set by the Board of Directors of the Company
> at its quarterly meeting and continuing hedging operations are
> subject to strict internal controls.[1]

---

[1]     Emphasis in boldface added unless indicated otherwise.

14.     The 1996 Form 20-F also contained an elaborate and materially false and

misleading description of the Company's purported "hedging" transactions:

> To reduce the impact on the Company of fluctuations in the price
> of gold, the Company engages in hedging transactions.  The
> principal hedging technique used by the Company is to sell gold
> forward on a spot deferred basis ("spot deferred contracts").  Spot
> deferred contracts allow the Company to defer delivery of the gold
> under contract by rolling the contract forward upon expiration,
> usually subject to a five or seven-year limit, and to receive the
> original contract price plus the interest-like premium ("contango")
> prevailing in the gold markets at the time of deferral for forward
> sales of comparable maturity.

15.     The 1996 20-F also falsely stated that derivative "hedges" were conducted for

protective purposes.  Describing its derivative trading, the Company falsely stated that it sought

only to "ensur[e] that financial commitments . . . can be met," and not to speculate on the future

price of gold:

> This well controlled, orderly market provides the foundation for
> many derivative instruments such as futures, options, warrants and
> swaps.  Substantial producers and purchasers use these markets to
> hedge, rather than to speculate, their respective positions.  The
> process involves forward contracts and options to hedge part of the
> production against falls in the gold price.  This secures a
> predictable cashflow which assists in planning and forecasting
> future revenues, ensuring that financial commitments and other
> undertakings can be met.

16.     On or about July 7, 1998, the Company filed with the SEC, a Form 20-F for the

fiscal period ending December 31, 1997 (the "1997 20-F").  The 1997 Form 20-F contained

essentially verbatim the statements quoted above from the 1996 Form 20-F:

> The Company pursues a hedging strategy designed both to protect
> the Company's cashflow and ensure its continued ability to
> conduct its business and service its obligations in the event that the
> gold price falls and to allow the Company to participate in upward
> appreciation or any rallies in the gold price.  The overall sales and
> hedging strategy is set by the Board of Directors of the Company
> at its quarterly meetings and continuing hedging operations are
> subject to strict internal controls.

4

* * *

To reduce the impact on the Company of fluctuations in the price of gold, the Company engages in hedging transactions. The principal hedging technique used by the Company is to sell gold forward on a spot deferred basis ("spot deferred contracts"). Spot deferred contracts allow the Company to defer delivery of the gold under contract by rolling the contract forward upon expiration, usually subject to a five to ten year limit, and to receive the original contract price plus the interest-like premium ("contango") prevailing in the gold markets at the time of deferral for forward sales of comparable maturity.

* * *

This well controlled, orderly market provides the foundation for many derivative instruments such as futures, options, warrants and swaps. Substantial producers and purchasers use these markets to hedge, rather than to speculate, their respective positions. The process involves forward contracts and options to hedge part of the production against falls in the gold price. This secures a predictable cashflow which assists in planning and forecasting future revenues, ensuring that financial commitments and other undertakings can be met.

17.    The preceding statements in Ashanti's 1996 20-F and 1997 20-F were materially false and misleading, as Ashanti had structured its derivative trading to profit from downward movements in gold prices, not to protect the Company against market fluctuations, and had, in the process, exposed itself to extreme risks of a sudden price movement. A simple hedging program approach is akin to insurance, insulating a gold producer from either rises or declines in gold prices; during periods of rising or declining gold prices, nominal trading losses are offset by gains in gold production revenue. Ashanti, however, engaged in "hedging" transactions to speculate in the gold market, not to "reduce the fluctuations in the price of gold," as it falsely stated. In truth, and unbeknownst to investors and analysts, Ashanti's "hedge" positions in the gold options markets had increased, not decreased its exposure to market fluctuations and volatility. Ashanti's increased "hedge" position amounted to — to use the post-Class Period statement of Sam Jonah, the Company's Chairman — a "reckless" bet that the price of gold

5

would fall as opposed to a strategy designed to protect the Company against fluctuations in the price of gold.

18.     On October 31, 1997, the Company filed a Form 6-K (Report of a Foreign Issuer) (the "October 1997 6-K") with the SEC which attached a copy of the Company's report on its financial results for the 3rd Quarter of 1997, ending September 30, 1997. The Company announced third quarter earnings of $15 million or 14 cents per share. In that report, the Company falsely and misleadingly represented that it was greatly protected against vicissitudes in gold prices: "The Company has approximately 5.8 million ounces hedged at a gold price of over US $420 per ounce. Ashanti is well protected against the current low gold price and is able to plan and execute its investment and exploration programmes with confidence."

19.     These statements in the October 1997 6-K materially falsely and misleadingly represented the nature and purpose of the Company's purported "hedge" book. These materially false and misleading statements repeated, reinforced and failed to correct the materially false and misleading statements in Ashanti's 1996 20-F and 1997 20-F. Contrary to these statements, the Company had assumed enormous undisclosed material risk to its financial stability and its ability to conduct and finance its operations. In the event of price volatility, not uncommon to the gold market, Ashanti would not merely incur losses, but face catastrophic liability and margin calls. The source of this exposure was the Company's "call" options contracts, and nonstandard option contracts with modified terms — sometimes called "exotics." The Company did not mention these exotics in the 1996 20-F or 1997 20-F, or in its October 1997 6-K. A single table in the October 1997 6-K at note 3 on page 11, which the Company misleadingly described as the "[f]ull details of the latest hedging position," excluded information that would have allowed investors to ascertain the true extent of Ashanti's exposure to volatility and sudden upward movements in the price of gold. For example, the table excluded the following data:

6

(a)      the strike prices and maturities of the various specific options contracts;

(b)      the counterparty agreements and margin requirements; and

(c)      especially the terms of the various exotic options contracts and lease rate swaps with embedded exotic options.

20.      As later revealed after the close of the Class Period, the purported "hedge" book, and in particular the call options and "exotics," amounted to an undisclosed speculative bet on the volatility of the price of gold. That undisclosed position was enormous and unjustifiable when compared to Ashanti's cash available to meet margin calls in the event that gold prices began to move suddenly upward. This material risk was concealed from and misrepresented to investors.

21.      On April 29, 1999, during an investor conference call, defendants Jonah and Keatley, as well as Chief Operating Officer Trevor Schultz and Managing Director of Exploration Peter Cowley, discussed the Company's purported "hedging" activities at length:

> MARK KEATLEY: Now, $38 million of that was in respect of scheduled hedge maturities and was credited to covering period revenue, $10 million was achieved by closing out some positions in respect of future years, we closed out those positions by buying back gold, when gold was in the low 270's, in early September, and that $10 million has been accrued and will be credited to future period revenues. That brings the accrued hedging in our balance sheets to U.S. $115 million. The overall hedging portfolio size is broadly unchanged, at 7.6 million ounces at an average price of U.S. $391 an ounce. But including the contracts that we have and the accrued income, we expect to realize a gold price of about $380 or better for the rest of this year. $375 an ounce in respect of a forecast 1999 production of over 1.6 million ounces and for 2000 and 2001, we've covered over 60% of projected gold production at an average price of over U.S. $380 an ounce. That is even taking into account the expanded production arising from the SAMAX acquisition.
>
> * * * *
>
> ELLIOT GLASSER: Okay, my second question is more complicated and again, it's for Mark. Can you give us a review of how your hedging program is related to the leasing rate for gold, in other words, my fear is with lease rates now around 1%, should we actually get a much higher gold price over the next year or two,

7

and lease rates go to 4%. How will that affect your earnings, how will that affect your results in that eventuality?

MARK KEATLEY: Okay, well, Elliot, lease rates, it's really one of the four parameters that we watch very closely in our hedging activities together with, obviously, the stock price, the U.S. dollar interest rates and overall volatilities. We take a very conservative view in terms of lease rates. I think we are relatively conservative relative to the producer spectrum. We are not exposed to any lease rate risk for the next 18 months from now. We have no lease rate exposure up to and including March 2000. It is often the case that you get spikes in the lease rates at the end of the year and people are expecting that there may be a particularly high spike towards the end of next year because of the millennium related issues. We are not exposed, should that eventuate. We do float a portion of the lease rates in our portfolio. The portion that is currently floated is approximately 25% of the hedging portfolio, slightly less than 2 million ounces of contracts have a floating lease rate, but those contracts are ones that mature after March 2000 and on, over the years after that. What we do as a matter of financial policy is that we cover our lease rate risk, so that for the next 12 months on a rolling basis, we take no lease rate risk. We've currently gone out 18 months because of this generalized millennium concern, that we will always protect at least 12 months. Does that address your question?

* * * *

MARK KEATLEY: Okay, Ted, the marked-to-market value at the end of the quarter was well over $250 million. We estimate that it was, in fact, in the region of U.S. $280 million. It was exceptionally high, because not only the gold spot price itself came down, but also the interest rates came down, as we all know during the quarter, and that had a very positive effect on the marked-to-market. In terms of the distribution of the accrued hedging income, the $115 million, that's pretty front end loaded, that's about — $30 million of that will be credited in the fourth quarter, in the remaining part of 1998, approximately $25 million in 1999, and then in 2000, 2001, 2002, it's about — between $10 million and $20 million in each of those years. So, it's really front end loaded towards the immediate three years.

* * * *

CAESAR BRIAN: Hi, good afternoon. Has there been any change in your hedge position since the end of September 1998? And if there has, could you tell us about it?

MARK KEATLEY: Yes, good morning, Caesar. We have slightly reduced our hedge position that there has been a sell off in gold, as

no doubt you are aware, during October and we did have some contract scheduled to mature this quarter, which we therefore closed out in the last few weeks, but their portfolio is still broadly about 7.5 million ounces. So, no significant change.

22.     On April 29, 1999, during an investor conference call, defendants Jonah and Keatley, as well as Chief Operating Officer Trevor Schultz and Managing Director of Exploration Peter Cowley, discussed the Company's purported "hedging" activities at length. At various points, Jonah misrepresented the purported "benefit" of Ashanti's "hedging activities," which he falsely claimed would offset the declining profits from Ashanti's mining operations. During the call, defendant Keatley misrepresented Ashanti's purported "hedging" program and falsely reiterated the Company's expectation that it would profit from increases in gold prices:

> Looking at the portfolio as a whole, we increased it during the quarter by just over 1 and a half million ounces to 8.75 million ounces, this matches the gross trend of our group production with the major contribution expected from Geita from next year, and it maintains hedging coverage at around five years group production. The average contracted price of the portfolio remains at $390 per ounce, providing us with a very strong revenue protection in the current gold price environment. At quarter end, the estimated mark-to-market value of the portfolio was 4215 million U.S. The portfolio consists of put options and long-term spot deferred sales with considerable flexibility and thus, we are well positioned to benefit as and when the gold price shows any signs of recovery. The full details of our hedging position as usual are set out in the notes to our press release.

23.     An analyst on the call asked Keatley what the mark to market value of Ashanti's hedge book would be if gold rose to $325 and $350. Keatley responded that if the price of gold rose to $350 by the next day, Ashanti's "hedge" transactions were such that its "hedge" book would not become negative in terms of its marked-to-market value and it would experience neither losses nor margin call requirements should gold prices or gold price volatility change suddenly:

> JOHN HATHAWAY: Yes. I have a question for Mark. And the question is, you gave us figures of marked-to-market valuation for

9

the hedgebook, but I wonder if you could give us the hypothetical valuation of the hedgebook if gold were to, to say, trade at 325 and 350.

MARK KEATLEY: Well, John, at 325 the book would be broadly neutral. And that would be the price at which our market-to-market would be effectively zero. Bear in mind that a lot of these — that some of these positions were put on relatively recently, and as for some of the marked-to-market of these positions, at this stage it is not significant. Obviously we expect that time will work to our advantage there as it has done up to now. With regard to 350, that is one of the scenarios that we use in our sensitivity analysis on the book. If the gold price was to go to $350 an ounce tomorrow, the marked-to-market would become negative, but we have negotiated very extensive credit agreements with all our counterparties that that would not result in any margin calls on us. If the price was to go to $350 over a period of between one and three months, we have enough flexibility in the book so that we could maneuver positions so as to avoid negative marked-to-market. It is really a question of when that happens as well as the price level. Does that answer your question, John?

JOHN HATHAWAY: Yes, it does. Just as a follow-up though, Mark, if that would occur, what sort of actions would you take? You said you would maneuver and take actions, obviously you would. What sort of things would you be doing in terms of restructuring in the book?

MARK KEATLEY: Sure. Well, John, let me emphasize that we are fundamentally bullish on gold. And the reason that we hedge is not because we are bearish, but just to give us the certainty to plan our capital programs.

JOHN HATHAWAY: Now I understand.

MARK KEATLEY: And, you know, we, like you, are looking forward to the time when gold will be back at 350. Now, some of the things we do are the following. We have very long-term hedging agreements with our counterparties. So we are able to go up to 15 years. But if you look at the profile of our spot deferred sales, most of those are bunched over the next two to five years. And so, we would have the flexibility to push those stock deferreds back in time if we wish to. Secondly, in terms of the option component of the book, we have considerable flexibility in terms of restructuring and renegotiating those options. So those are some of the things we can do. But, let me say, and this is important to underline that this book is managed extremely actively. We mark-to-market the entire portfolio once a week. And when we do that,

> we also do sensitivity analysis, while you've highlighted the gold
> price. But actually a variable is much more significant in terms of
> the value of the hedgebook moving around with U.S. dollar interest
> rates. And our main concern during this last quarter was that there
> might be a rise in US dollar interest rates owing to the strength of
> the U.S. economy which would cause the value of the marked-to-
> market to fall. So we've put in place, and we've done this in two
> large transactions now over the last four months. Our interest rate
> flopped across the book which locks in for us the benefit of the
> current, relatively low U.S. dollar interest rates in terms of the five-
> year swop rates. So we're protected against a rise in interest rates.
> And we look also at gold lease rates and we look at volatilities.
> We do relative analysis on each of those things. And so we would
> like to say — we may not have anticipated 100% of all scenarios,
> but we have anticipated probably, you know, a good many above
> 90%, and we have got contingency plans in place that would
> address those.

Thus, defendant Keatley specifically falsely assured investors that Ashanti could well withstand

price increases that were larger and faster than the $57 dollar move over a seven-day period in

October 1999 that triggered a derivatives losses and a liquidity crisis so severe that it devalued

Ashanti's trading book from a positive $290 million to a negative by $570 million and caused

other losses. In his statements, Keatley falsely stated that Ashanti knew the terms of its

derivatives transactions and was fully capable of analyzing the effects of rapidly rising gold

prices and rising implied volatility whereas in fact Ashanti had no such capabilities. These were

all false statements of present facts.

24.     The statements in Ashanti's October 1997 6-K, defendants' October 28, 1998 and

April 29, 1999 investor conference calls were each materially false and misleading when made

as they failed to disclose and misrepresented the following adverse facts which were then known

to defendants or recklessly disregarded by them:

(a)     The Company did not set forth "full details" but omitted to disclose numerous
derivative transactions that increased the risk for Ashanti and failed to disclose the
amount of future gold production that Ashanti had entangled in its risky
derivatives transactions.

11

(b) The Company was employing option contracts in order to increase revenue, i.e., by selling call options and exotic options and receiving premium income from the buyers rather than in order to protect itself against market fluctuations, and these contracts exposed the Company to margin calls should the price of gold rise suddenly.

(c) It was not true, as defendant Keatley stated in the April 29, 1999 investor conference call that hedging provides "a very strong revenue protection in the current gold price environment," as the Company's purported "hedge" book was not related to protecting the Company against fluctuations in the price of gold but rather was an undisclosed, reckless, non-neutral, directional bet that the price of gold would fall steadily and the volatility of gold would not rise, and an undisclosed reckless assumption of option and swap risk for up-front premium income.

(d) The Company's "hedge" position would expose the Company to substantial margin calls should the price of gold rise substantially and that the Company lacked the cash to meet those margin calls should that scenario arise. In other words, the Company had increased its "hedge" position and taken the risk that if the price of gold were to rise suddenly, Ashanti would find itself unable to meet the obligations it had assumed.

(e) The Company's mark-to-market value of its "hedge" book, discussed in the April 29, 1999 investor conference call, of $215 million, was materially misleading as it failed to disclose the extreme risks that Ashanti had assumed in its "hedge" position by engaging in the speculative trading of exotic option contracts.

(f) Therefore, the Company's purported "hedge" book was not, in effect, a hedge book but, rather, an enormous and risky speculation that the price of gold would fall steadily and without volatility.

25.     On June 30, 1999, the Company filed with the SEC, a Form 20-F for the fiscal period ending December 31, 1998 (the "1998 20-F"). Like the 1996 20-F and 1997 20-F, the 1998 20-F falsely described Ashanti's "principal business" as the "mining of gold." The 1998 20-F further falsely stated that the Company was "primarily engaged in the mining and processing of gold ores and the exploration and development of gold properties in Africa."

26.     The 1998 20-F also falsely stated that the Company was engaged in derivatives trading to insulate it from fluctuations in the price of gold, and thus help ensure "predictable cash flow" for the Company. Specifically, the 1998 20-F falsely represented:

Ashanti's principal business is the mining and processing of gold.
Its revenues and cash flows are therefore strongly influenced by

12

the price of gold, which can fluctuate widely and over which the Company has no control.

Ashanti, in common with many other gold producers, engages in hedging activities to protect its cash flows against the risk of falls in the gold price.

The 1998 20-F also contained an elaborate and materially false and misleading description of the

Company's purported "hedging" transactions:

### Hedging Operations

To reduce the fluctuations in the price of gold, the Company engages in hedging transactions. The principal hedging technique used by the Company is to sell gold forward on a spot deferred basis ("spot deferred contracts"). Spot deferred contracts allow the Company to defer delivery of the gold under contract by rolling the contract forward upon expiration, usually subject to a five to fifteen year limit, and to receive the original contract price plus the interest-like premium ("contango") prevailing in the gold markets at the time of deferral for forward sales of comparable maturity. The level of contango prevailing at any time is based upon the spread between the gold borrowing rate and the interest rate (usually based on LIBOR) prevailing at such time. To the extent that the Company hedges its gold production, it may not fully participate in increases in the spot price of gold on the portion of its production which is hedged.

As at December 31, 1998, the Company had entered into forward sale contracts covering 7.2 million ounces at an average price of US$390 per ounce. Of the these contracts 4.4 million ounces were forward sales (mainly spot deferred contracts) at an average price of US$394 and 2.8 million were of put option contracts at an average price of US$384 an ounce. The forward sale and put option contracts scheduled for delivery in 1999 amount to 1.1 million ounces at an average price of US$361 an ounce. In addition, Ashanti has granted on a net basis 3.4 million ounces of call option which expire over 12 years at an average strike price of US$399 per ounce. Total hedging contracts including all call options therefore represented 46 percent of the Company's reserves as at December 31, 1998.

The mark-to-market value of its portfolio as at December 31, 1998 was US$201 million, excluding accrued income. The reduction in the mark-to-market figure from US$278 million as at December 31, 1997 was mainly the result of closing out hedge

contracts early with a value of US$56 million to retire the Bibiani
and Siguiri project finance facilities.

27.    The 1998 20-F also falsely stated that derivative "hedges" were conducted for

protective purposes.  Describing its derivative trading, the Company falsely stated that it sought

only to "ensur[e] that financial commitments . . . can be met," and not to speculate on the future

price of gold:

> This well controlled, orderly market provides the foundation for
> many derivative instruments such as futures, options, warrants and
> swaps.  Substantial producers and purchasers use these markets to
> hedge, rather than to speculate, their respective positions.  The
> process involves forward contracts and options to hedge part of the
> production against falls in the gold price.  This secures a
> predictable cash flow which assists in planning and forecasting
> future revenues, ensuring that financial commitments and other
> undertakings can be met.

The 1998 20-F also falsely repeated that its hedging strategy: "Ashanti enters into derivative

financial instrument contracts in order to protect itself . . . .  The Company does not acquire

derivative financial instruments for speculative purposes."

28.    The preceding statements in Ashanti's 1998 20-F were materially false and

misleading, as Ashanti had structured its derivative trading to profit from downward movements

in gold prices, not to protect the Company against market fluctuations, and had, in the process,

exposed itself to extreme risks of a sudden price movement.  A simple hedging program

approach is akin to insurance, insulating a gold producer from either rises or declines in gold

prices; during periods of rising or declining gold prices, nominal trading losses are offset by

gains in gold production revenue.  Ashanti, however, engaged in "hedging" transactions to

speculate in the gold market, not to "reduce the fluctuations in the price of gold," as it falsely

stated. In truth, and unbeknownst to investors and analysts, Ashanti's "hedge" positions in the

gold options markets had increased, not decreased its exposure to market fluctuations and

volatility. Ashanti's increased "hedge" position amounted to — to use the post-Class Period

14

statement of Sam Jonah, the Company's Chairman — a "reckless" bet that the price of gold

would fall as opposed to a strategy designed to protect the Company against fluctuations in the

price of gold.

29.     Misled by Ashanti's fraudulent description of its hedging activities, though, and

unaware of the Company's well-concealed trading risks, analysts praised the Company's

purported hedging acumen. Bloomberg Business News reported on July 28, 1999, for example,

that the London branch of Investec Securities, in a report published earlier that month, had stated

that: "The most remarkable feature of Ashanti is not the quality of its ore body, nor the skills of

its mining team. . . [it is] the financial ability of its treasury department which has managed to

construct a hedge position that insures the future of the mine well into the next century."

30.     On July 28, 1999, with the price of Ashanti stock opening at $5.75 per share, the

Company filed a Form 6-K (Report of a Foreign Issuer) (the "July 1999 6-K") with the SEC

which attached a copy of the Company's report on its financial results for the 2nd Quarter of

1999, ending June 30, 1999.  The Company announced that second quarter profits rose 6 percent,

with earnings reaching $16.4 million or 15 cents per share.  In that report, the Company falsely

and misleadingly represented that it had increased its hedging activities and was greatly

protected against vicissitudes in gold prices: "Ashanti increased its level of hedging protection to

11 million ounces. Just under 50% of reserves are now hedged at an average price of US$389

per ounce, protecting the Group against the current difficult gold market."  Moreover, the

Company stated in its July 1999 6-K that its hedging position provided Ashanti with

"considerable exposure to upward movements in the gold price."

31.     These statements in the July 1999 6-K materially falsely and misleadingly

represented the nature and purpose of the Company's purported "hedge" book.  These materially

false and misleading statements repeated, reinforced and failed to correct the materially false and

misleading statements in Ashanti's 1996 20-F, 1997 20-F and 1998 20-F.  Contrary to these

statements, the Company had assumed enormous undisclosed material risk to its financial

stability and its ability to conduct and finance its operations.  In the event of price volatility, not

uncommon to the gold market, Ashanti would not merely incur losses, but face catastrophic

liability and margin calls.  The source of this exposure was the Company's "call" options

contracts, and nonstandard option contracts with modified terms — sometimes called "exotics."

The Company did not mention these exotics in the 1996 20-F, 1997 20-F, or 1998 20-F or in its

July 1999 6-K.  A single table in the July 1999 6-K at note 3 on page 11, which the Company

misleadingly described as the "[f]ull details of the latest hedging position," excluded information

that would have allowed investors to ascertain the true extent of Ashanti's exposure to volatility

and sudden upward movements in the price of gold.  For example, the table excluded the

following data:

<ul>
<li>(a)     the strike prices and maturities of the various specific options contracts;</li>
<li>(b)     the counterparty agreements and margin requirements; and</li>
<li>(c)     especially the terms of the various exotic options contracts and lease rate swaps with embedded exotic options.</li>
</ul>

32.     As later revealed after the close of the Class Period, the purported "hedge" book,

and in particular the call options and "exotics," amounted to an undisclosed speculative bet on

the volatility of the price of gold.  That undisclosed position was enormous and unjustifiable

when compared to Ashanti's cash available to meet margin calls in the event that gold prices

began to move suddenly upward.  This material risk was concealed from and misrepresented to

investors.

33.     In the July 1999 6-K, the Company stated that "[t]he estimated mark-to-market

value of the hedge book increased to about US$290 million as at 30 June 1999 as a result of the

increase in hedges and lower spot prices."  Defendants had to have calculated and tracked the

volatility in the price of gold in order to be able to make any representation about the value of

and risk profile of the purported "hedge" book since volatility is a fundamental factor in the

equation to determine the value of an option. In the alternative, defendants were reckless in

making statements about the value of the "hedge" book if they failed to account for the effects of

volatility on the options in the "hedge" book.

34.     On July 28, 1999, defendant Keatley was interviewed by Antony Sguazzin of

Bloomberg Business News concerning the Company's second quarter financial results. That

interview was carried by Bloomberg Business News. During the interview, defendant Keatley

falsely stated that the Company's hedging policy had been directed toward protecting the

Company from gold price fluctuations:

> "It has been the strategic aim of Ashanti to maintain a high level of
> protection. We are going to up our production profile with the
> construction of the very large Geita mine in Tanzania, which will
> go into production in the second half of the year. . . We have been
> building up our hedge book to maintain the same level of coverage.
> . . Fortunately we were able to do this in the early part of the
> quarter before the announcement by the Bank of England of their
> gold auctions. . . Hedging gives us the assurance that our cash flow
> will be sufficient for our new projects and to service our debt."

In reality, but undisclosed to investors, the Company's purported "hedge" book did not offer it a

"high level of protection," as the Company's "hedge" book in fact was a reckless speculation on

declining gold prices and declining price volatility. In fact, Ashanti faced catastrophic losses

once gold returned to prior price and volatility levels.

35.     On July 28, 1999, during an investor conference call, defendants Jonah and

Keatley, as well as Chief Operating Officer Trevor Schultz and Managing Director of

Exploration Peter Cowley, discussed the Company's purported "hedging" activities at length. At

various points, Jonah mentioned the "benefit" of Ashanti's "hedging activities," which would

offset the declining profits from Ashanti's mining operations. During the call, defendant Keatley

misrepresented Ashanti's purported "hedging" program and falsely reiterated the Company's

expectation that it would profit from increases in gold prices:

> Let me start with the hedging program. As we've commented
> before, we've been building up our hedging portfolio over the last
> year and a half, to reflect the anticipated increase in our group
> production, particularly with Geita coming on stream
>
> Early in the quarter, mainly in the month of April, we did add
> further to our portfolio, particularly with longer-dated contracts,
> and we've been able to take the portfolio up to a total of 11 million
> ounces — that's almost half of our reserves, which are protected at
> a contracted gold price, which is just slightly below $390 a [sic]
> ounce. Clearly, we were surprised as the rest of the industry, by
> the dramatic announcement by the Bank of England in May, and
> we are pleased that we were able to increase the portfolio mainly
> prior to that date.
>
> Another thing which I'd like to underline is that the structure of the
> portfolio is such as to give us very substantial upward exposure
> to the gold price. If you look at it in detail, fully 33 percent of the
> portfolio consists of puts — 3.6 million ounces are high-priced
> puts. Sixty percent, or 6.1 million ounces, are long-term spot
> deferred sales, where, as we've commented before, we enjoy very
> considerable flexibility in terms of the timing of deliveries. We've
> also reduced our outstanding call options from 3.5 million ounces;
> it's been reduced to 2.8 million ounces, at an average strike price
> of $406 an ounce which is clearly way above today's level. So,
> although hedging is an important part of our management of our
> finances, and it does protect our cash flow very strongly during the
> next few years, it's also worth underlining that we expect to benefit
> fully from the recovery of the gold price when that finally does
> occur. And, in fact, it's interesting to observe, in that respect, that
> our stock price continues to track the gold price closely, both up
> and down.
>
> The mark to market value of the hedging portfolio as of the end of
> the quarter was roughly $290 million — 2-9-0 million U.S. dollars.
> Overall, when we look at the cash we've raised over the last five
> years, as well as the value of the portfolio, it's a program that's
> added almost $1 billion to shareholder value over that time. In
> terms of the rest of this year, we expect to maintain a realized gold
> price of about $380.

36.     An analyst on the call asked Keatley what the mark to market value of Ashanti's

hedge book would be if gold rose to $300 and $325. Keatley responded that Ashanti would

experience only minimal losses and margin call requirements should gold price volatility change

suddenly:

> In terms of the hedging, in our current sensitivity analysis, which we update weekly, we anticipate that at, at a gold price of $300 an ounce today — that's, you know, if, without any action on our part to restructure the portfolio, simply — a $40 an ounce increase overnight in the gold price, the, our portfolio would be approximately at break even. They would be more or less at nil value.
>
> At a gold price of $325 an ounce, which is $65 dollars an ounce higher than — well, let's say, $70 an ounce higher than today's level, the mark to market would be negative, but it would be within, well, within the levels of margin calls which we've negotiated with our counter parties. We have some $350 million of credit available from our counterparties in the form of mark to market limits. I guess, I'm sure you're aware, in asking that question, that that's, that's a severe stress test to subject a portfolio to, and it's in, some ways, an unrealistic one because — these increases typically do not happen in one day, on that order of magnitude. But I agree with you that this is an appropriate question to ask because it's one we do ourselves every week. We want to make sure we can withstand, you know, even a very rapid, very sudden, big increase in the price.

Keatley also falsely stated that any vulnerability Ashanti had to sudden upward movements in

gold prices would only be temporary:

> Now, the profile of the mark to market is that these trades accrete value over time in a way that is more than linear. The recent trade will show, will not show any significant mark to market at this time. But with the passage of time, if there's no change in the gold price, those will accrue value, rapidly. So, if we did no change to our portfolio, six months from now, the sensitivity to the gold price would be, would be much less that what I've indicated today.

Thus, defendant Keatley specifically falsely assured investors that Ashanti could well withstand

price increases that were larger and faster than the $57 dollar move over a seven-day period in

October 1999 that triggered a derivatives losses and a liquidity crisis so severe that it devalued

Ashanti's trading book to a negative by $570 million and caused other losses. In his statements,

Keatley demonstrated that Ashanti knew the terms of its derivatives transactions and was fully capable of stating the effects of rising implied volatility as present facts.

37.     The statements in Ashanti's July 1999 6-K, defendant Keatley's July 28, 1999 interview, and defendants' July 28, 1999 investor conference call were each materially false and misleading when made as they failed to disclose and misrepresented the following adverse facts which were then known to defendants or recklessly disregarded by them:

(a)     The Company was employing option contracts in order to increase revenue, i.e., by selling call options and exotic options and receiving premium income from the buyers rather than in order to protect itself against market fluctuations, and these contracts exposed the Company to margin calls should the price of gold rise suddenly.

(b)     It was not true, as defendant Keatley stated in the July 28, 1999 interview, that the Company's "strategic aim" was to "maintain a high level of protection" nor was it true, as defendant Keatley stated in the July 28, 1999 investor conference call that hedging "protect[s the Company's] cash flow very strongly during the next few years," as the Company's purported "hedge" book was not related to protecting the Company against fluctuations in the price of gold but rather was an undisclosed, reckless, non-neutral, directional bet that the price of gold would fall steadily and the volatility of gold would not rise, and an undisclosed reckless assumption of option and swap risk for up-front premium income.

(c)     The Company was not "well, within the levels of margin calls" and the Company's "hedge" position would expose the Company to substantial margin calls should the price of gold rise substantially and that the Company lacked the cash to meet those margin calls should that scenario arise.  In other words, the Company had increased its "hedge" position and taken the risk that if the price of gold were to rise suddenly, Ashanti would find itself unable to meet the obligations it had assumed.

(d)     The Company's mark-to-market value of its "hedge" book, reported in its July 1999 6-K and affirmed in the July 28, 1999 investor conference call, of $290 million, was materially misleading as it failed to disclose the extreme risks that Ashanti had assumed in its "hedge" position by engaging in the speculative trading of exotic option contracts.

(e)     Therefore, the Company's purported "hedge" book could not provide the "assurance" of "sufficient" "cash flow" for the Company to meet its needs and obligations.  Indeed, the "hedge" book was not, in effect, a hedge book but, rather, an enormous and risky speculation that the price of gold would fall steadily and without volatility.

20

38.     On July 29, 1999, the Financial Times reported: "Sam Jonah, chief executive, said yesterday that the expansion of Ashanti's hedge book was designed to keep pace with the expansion of its mining operations, notably Geita in Tanzania, which is due to start producing by end-2000." Mr. Jonah's statement falsely represented the purpose and risk of the purported "hedge" book and failed to disclose the true reasons behind Ashanti's expanding "hedge" book.

39.     Ashanti's share price, buttressed by the Company's false statements, continued to climb over the next two months, reaching $7.4375 on September 24, 1999. On September 26, 1999, fifteen European central banks announced that they were limiting sales and loans of gold. In response to this announcement, the price of gold began to rise — by more than $55 per ounce, a fluctuation, or price volatility, not uncommon to the gold market.

40.     Three days later, on September 29, 1999, Ashanti issued a press release, reprinted in The Regulatory News Service and elsewhere on September 30, 1999. In the press release, the Company made a number of materially false and misleading statements regarding its purported "hedge" book, falsely representing that the Company had increased its protection against market fluctuation, when, in fact, Ashanti had increased its exposure to increasing gold prices and gold price volatility. The press release thus falsely stated:

> Ashanti operations have benefitted from the increase in the price of gold since the recent announcement of co-ordinated action by central banks to regulate official gold sales.
>
> Ashanti has restructured 80% of its hedge book to remove the sensitivity of the hedge value to further rallies in the gold price. The restructuring was initiated before the recent rally, as part of the Company's contingency planning, and has covered approximately 9 million ounces (out of Ashanti's 11 million ounces book of forwards and put options). It has included converting a substantial component of the forward sales positions into synthetic put options. The Company has already, before the rally, eliminated any exposure to floating lease rates during the rest of 1999 and the first quarter of 2000. Ashanti's hedge book continues to be actively managed, and tightly controlled. Management is satisfied that the hedge portfolio is robust in the current gold market and

will generate a realized gold price of US$380 per ounce in 1999
and about US$360 per ounce next year.

41.    The September 29, 1999 press release was materially false and misleading in a

number of ways:

(a)    The Company falsely characterized its trading strategy as "contingency planning,"
rather than the high-stakes speculation that it was.

(b)    The Company also falsely claimed that it had "eliminated any exposure to floating
leases rates," when, in fact, its exposure had increased. (These "lease rates"
governed the terms by which the Company leased gold fields from other parties to
meet its obligations to mine and deliver gold to other parties, as well as the terms
of another type of "hedge" activity the Company employed, and misused for
speculative bets, the "lease rate swap.")

(c)    The Company falsely claimed that its "hedge" book was "actively managed, and
tightly controlled," even as the Company took on a "reckless" bet on steadily
trending downward prices that exposed it to unusually large liabilities should gold
prices rise suddenly or volatility increase.

42.    Moreover, the statements in the September 29, 1999 press release were each

materially false and misleading when issued as they failed to disclose and misrepresented the

adverse facts set forth above and which were then known to defendants or recklessly disregarded

by them. In addition, the statements failed to disclose the following adverse facts:

(a)    the Company's purported "hedge" book was laden with speculative options that
assumed risks adverse to the Company's purpose of mining gold for the receipt of
up-front premium income, and that increased, rather than decreased, its
"sensitivity" to market fluctuations;

(b)    the Company's "hedge" book was not "actively managed, and tightly controlled,"
as the Company took on a "reckless" bet on downward prices and volatility that
exposed it to unusually large liabilities in the event the price of gold rose
suddenly;

(c)    the Company's disclosures excluded the terms of its "exotic" option contracts,
which would have permitted investors to recognize the speculative nature of the
Company's purported "hedge" book;

(d)    the rising gold price had caused the Company's "hedge" book to have an
increasingly negative value such that the Company would be required to meet
substantial margin calls which the Company would be unable to do;

    (e)    the mark-to-market value of the Company's "hedge" book, as later reported by The Financial Times on October 9, 1999, was <u>negative</u> $570 million; and

    (f)    it was not true that the Company had eliminated all exposure to floating lease rates. Rather, the Company had increased its exposure to floating lease rates, and these materially negatively impacted the Company's "hedge" book.

43.    Unaware of Ashanti's impending financial crisis and accepting Ashanti's explanation of its trading activities, the market drove Ashanti's share price to its Class Period high of $9.375 per share.

44.    On September 30, 1999, Merrill Lynch issued a report based on an update from the Company, and rated the stock a "Buy." In particular, Merrill Lynch's reported the Company's statements as follows: "Ashanti has restructured its hedge book to lower the drag on leverage to rising prices and to reduce the potential negative impacts of volatile lease rates & gold prices."

45.    On October 5, 1999, Ashanti issued a press release announcing that "in light of the continued turmoil in the gold market, the Company continues to monitor its hedging position and has over the last few weeks managed the "hedge" book so as to reduce the sensitivity of the "hedge" value to rallies in the gold price." The press release stated:

> Whilst the Ashanti Group has structured its hedging arrangements with counterparties to allow a degree of flexibility in the event of prices rising, the recent sudden and unexpected rise in the price of gold and the dramatic increase in the volatility of the gold market has led to certain counterparties being entitled to margin calls. The Ashanti Group has entered into a joint arrangement with its major hedging partners for continuing support.

46.    In response to the Company's revelations, the price of Ashanti common stock plummeted from $9.3785 per share to $5.50 per share on extremely heavy trading volume.

47.    While the rise in gold prices "increased the long-term value of the company's 23m ounces of reserves," The Financial Times wrote on October 6, 1999, the rise had demolished Ashanti's purported "hedge" book, which losses The Financial Times found to be

23

"unusually high" as a "proportion of total reserves." Moreover, the purported "hedge" book's

losses on October 6, 1999, were $450 million, above the level at which Ashanti's counterparties

were entitled to call in additional margin deposits, "thought to total more than $150m." The

margin calls stemmed from losses incurred in forward sales, call options, and "exotics."

47.     On the same day, Bloomberg Business News reported on the Company's startling

stock price drop, stating that Ashanti's huge "hedges" had been a gamble on steadily declining

gold prices, and that now margin calls threatened the Company's viability:

> Ashanti Goldfields Co., Africa's third-largest gold
> producer, fell 35 -percent to a record low, its biggest one-day drop,
> on investor concern creditor banks could demand payments the
> company would not be able to meet.
>
> Accra-based Ashanti sold nearly seven years of production
> in advance, partly to finance an aggressive expansion in
> production, in a bet gold prices would keep falling.  When 15
> European central banks promised on Sept. 26 to limit gold reserve
> sales and lending, prices soared as much as 27 percent, exposing
> Ashanti and other forward sellers to possible losses.
>
> The company said yesterday some of the banks with which
> it signed forward sales contracts are now entitled to margin calls,
> or demands for cash or securities to verify that it can meet its
> obligations.  Investors are concerned Ashanti may not be able to
> meet those calls.
>
> "They have to satisfy the market that they have the liquidity
> to cover the contracts," said Roger Chaplin, an analyst at T. Hoare
> Canaccord.

48.     On October 6, 1999, Ashanti issued a press release announcing that it had entered

into a temporary standstill arrangement with its hedging counterparties "in order to give the

Company time to work out a more permanent arrangement with its counterparties."  The price of

Ashanti common stock declined further to $4.125 per share.

49.     On October 7, 1999, negative commentary began to emerge not only upon

Ashanti's huge trading losses, but upon the secrecy with which Ashanti had managed them,

which, as one Financial Times column suggested, had left investors in the lurch:

> If Ashanti's balance sheet were stronger, it could probably trade through the crisis, by paying margin calls as they fall due and eventually delivering the gold. Its banks have provided it with leeway on this front by agreeing on a temporary standstill agreement. But Ashanti's lack of openness has not helped to reassure investors.

Ashanti had not merely traded recklessly, but concealed its gamble from inventors.

50.    <u>The Financial Times</u> reiterated these concerns on October 8, 1999, by describing

Ashanti as a company in financial distress, whose trading activities had been a mystery, and

whose current liabilities could not be established:

> One New York analyst says: "Ashanti has got to sell something, either the whole company or a major asset. But at present the company looks like a black hole. No responsible management is going to make a bid for it without knowing what its maximum potential liabilities are." . . . Few outsiders are in a position to judge, since hedge books are both secret and fiendishly complicated.

While Ashanti had disclosed limited information about its purported "hedge" book, it had

concealed information that would have informed investors as to the terms of its positions and the

extent of the Company's potential exposure and present liability.

51.    On October 8, 1999, <u>The Mining Journal</u> published a report on Ashanti and its

hedging problems. The report questioned the Company's public disclosures concerning the

nature and value of its "hedge" book. For the first time, the recklessness of Ashanti's "hedging"

positions was revealed:

> Last week, Ashanti Goldfields Co. Ltd of Ghana announced that it had restructured most of its hedging positions by buying back 9 Moz of gold, representing 80% of its total programme. The chief financial officer of Ashanti, Mark Keatly, told Reuters that Ashanti had bought back its forward sales at prices well below the peak spot levels last week of US$ 327/oz, noting that the spot price of gold had been down in the US$ 280-290/oz region earlier in the week. The restructuring was in part designed to reduce Ashanti's exposure to the rising lease rate by converting contracts from floating to fixed rates. The move had apparently been planned for several weeks, during the period of more gently rising lease rates.

This week, Ashanti stunned the market by announcing that its restructured hedging book, which now covers 10 Moz, has a "replacement cost" (interpreted as a negative marked -to-market value) of about US$ 450 million (at a spot price of US$ 317.50/oz). Ashanti stated that the "sudden and unexpected" rise in the gold price and the accompany "dramatic" increase in volatility "has led to certain counterparties being entitled to margin calls", and indicated that it is in discussions with those counterparties. Shares in Ashanti fell by 45% from Monday to Tuesday, as the market struggled to interpret the news.

In a somewhat badly-worded and confusing statement released on Tuesday, the company noted that "at current gold prices, the replacement cost of the hedge-book will decrease over time". However, Ashanti reminded commentators that "any increases in the replacement cost of the hedge book arising from further increases in the gold price will be more than offset by corresponding increases in the value of Ashanti's reserves (in the ground)". The company had proven and probably reserves totaling 23 Moz at the end of last year.

On Thursday, Ashanti was able to announce that it had entered into a "temporary standstill agreement with its hedging counterparties" to allow time for a more permanent arrangement. The counterparties have agreed not to make margin calls.

The huge negative value of the hedging book is particularly surprising given Ashanti's hedging position at the end of June. The company then reported a total of 11 Moz covered by a variety of forward contracts and put options, from 1999 to 2013, at an average price of US$389/oz. The average prices for forward contracts in 1999 and 2000 were all shown as above US$380/oz. The company had also sold 2.9 Moz in call options to other parties, but none of the prices shown are 'in the money' (i.e. worth exercising). The only indication consistent with this week's announcement is the fact that the forward contracts specifically marked as having fixed lease rates represented only 900,000 oz and did not start maturing until 2007.

The "replacement cost" of US$450 million is also completely at odds with rough marked-to-market values for Ashanti's hedging book calculated by analysts, based on the company's stated hedging positions. The implication is that the reported hedging positions, although indicating the company's exposure to movements in gold price, did not clearly show its potential exposure to changes in lease rate and volatility. Ashanti was unavailable for comment to clarify the position, other than to confirm that the figure of US $450 million ascribed to the current hedging book is a negative value.

Ashanti had not merely traded unwisely, it had materially falsely characterized its purported

"hedge" book as a protective tool, and concealed the truth from investors.  In fact, and

unbeknownst to investors, Ashanti's hedging had materially increased the Company's risk.

52.    The Financial Times, on October 9, 1999, described how gold's return to the price

median for the prior decade and the return to prior levels of gold price volatility undermined

Ashanti's purported "hedge" book:

> The problem now is that the sudden rise in the gold price
> has taken it to a higher level than the prices contained in Ashanti's
> derivatives deals. So whereas they were until very recently an asset
> — by securing for Ashanti a higher gold price than the actual price
> — they have now become a liability.  Ashanti says the derivatives
> were worth $ 290m in June and are now worth minus $ 570m.
> Anyone whose derivatives are in that state is supposed to deposit  $
> 270m in cash to demonstrate good faith.  But gold-rich Ashanti is
> cash-poor.

Ashanti's purported "hedge" book had exposed it to losses of $570 million and margin calls of

$270 million, which it could not meet.

53.    On November 8, 1999, an article in the Financial Times entitled "Ashanti Left

Dangerously Exposed By Holding High-Risk Exotics: Investment Bank Sold Company Cheap

Derivatives As 'Insurance Policy'" reported that "Ashanti . . . was brought to its knees by

holding cheap, high-risk exotics."  According to the article, about 15 percent of the Company's

"hedge" book was comprised of these high-risk exotics.  In the article, defendant Keatley

admitted that Ashanti's undisclosed exposure could have been even much worse than the

Company had already experienced: "Mark Keatley, Ashanti's chief financial officer, said that a

worst-case scenario would have pushed its total "hedge" exposure up by 50 per cent to 15

[million] ounces — amounting to 70 per cent of its total gold reserves, the company's sole

assets."  The article also quoted other  industry sources about the nature of the undisclosed

exotics that Ashanti had concealed: "Anglogold, the large South African gold miner, said it

would not buy such high-risk derivatives because the risks are unquantifiable. A bank involved

in the Ashanti rescue described the cheap, high-risk derivatives as 'toxic waste' because 'they sit

there quietly and contaminate everything.'"

54.     In the November 8, 1999 article in the <u>Financial Times</u>, defendant Jonah

admitted: "I am prepared to concede that we were reckless. We took a bet on the price of gold.

We thought it would go down and we took a position." Defendant Jonah thus admitted that the

Company had falsely characterized the Company's purported "hedge" book as a protective

measure intended to secure the Company's cash flow and render it insensitive to market

fluctuations. In fact, the purported "hedge" book held a collection of speculative trades that

increased, rather than decreased, the Company's vulnerability to volatility in the gold market.

55.     In its Form 6-K for the month of April 2000, filed with the SEC on April 12,

2000, the Company described certain of the severe financial consequences of its undisclosed

speculation concealed in the "hedge" operations. When the mark-to-market valuation of the

"hedge" book reached negative $570 million in early October 1999, "The large negative

valuation required the Group to post US$270 million in cash as collateral which was not

available." In addition, the Company was forced to issue warrants for 15% of the Company's

stock. Moreover, "Ashanti also undertook to sell a 50 per cent interest in the Geita mine, as part

of a long-term restructuring that would reduce its debt."

56.     In the Form 6-K for the Month of June 2000, filed with the SEC on June 5, 2000,

the Company detailed the wholesale dismissal of its board and principal officers after the

deception and collapse during the Class Period. Defendant Keatley was removed as Chief

Financial officer and from the Board of Directors. In addition, P.M. Tarsh, H.K. A Otoo,

William S. Ryrie, K. Ansah, and F. Ohene-Kena all left the Board of Directors. By press release

on February 14, 2000, Ashanti revealed that its Director and Chairman of the Board, Richard

Kwame Peprah, had "resigned" in the wake of the Class Period events.  Already, on October 5,

1999, Ashanti had announced that Jean Claude Gandur had resigned.

57.     The Company later admitted the extent of the "crisis" engendered by its purported

"hedge" trading when it published its Form 20-F for the fiscal period ending December 31, 1999

(the "1999 20-F"), filed on June 30, 2000:

### Recent Developments

In September 1999, as a result of the short-term rise in the
price of gold the Group was faced with potential margin calls from
its hedge counterparties, which the Company could not meet,
which caused a short term liquidity crisis.  In October 1999, the
Company entered into a temporary standstill arrangement with its
banks and its hedge counterparties.  Agreement was reached with
the hedge counterparties exempting the Company from the
requirements to post margin on any of its contracts up to December
2002, subject to the Company satisfying certain conditions and
complying with certain covenants.  In exchange, the Company
agreed to an issue of warrants by a wholly-owned subsidiary to
subscribe for mandatorily exchangeable securities exchangeable on
exercise into approximately 15% of the Company's share capital
(assuming full exercise of the warrants) at US$4.75 per Ashanti
share.  The subscription price was subsequently revised to US$3
per Ashanti share.  However, the Company continued to
experience a liquidity crisis due to the fact that it had not been able
to secure the additional financing it needed to develop Geita, nor to
close out hedge contracts.  As at December 31, 1999, the standstill
agreement with the Company's banks and hedge counterparties
was in operation.

The Board of Ashanti reviewed several potential long-term
solutions to the crisis and, following discussions with the
Government of Ghana and its bank group (consisting of Ashanti's
lending banks and hedge counterparties) the solution which the
Group believed would be acceptable to its stakeholders was to
secure a new US$100 million debt facility to enable the completion
of the Geita mine and to secure the sale of a 50% joint venture
interest in Geita in order to reduce debt levels.

The Company further stated in its 1999 20-F that its disastrous financial situation was

exacerbated by high lease rates, triggered by the sudden increase in gold prices: "Severe

shortages of gold liquidity also led to high gold lease rates.  During most of October 1999, the

gold price traded in a range of US$300-320 per ounce, and volatilities and lease rates remained high." The Company had been hurt badly by the high lease rates engendered by the volatile gold market, even though the Company had previously falsely claimed that its hedging strategy had eliminated all exposure to increases in lease rates. The Company, criticized during the Class Period for the secrecy with which it managed its hedge portfolio, provided, in the 1999 20-F, what it called a "more detailed analysis than previous years" of current trading activities.

## UNDISCLOSED ADVERSE INFORMATION

58.     The market for Ashanti shares was open, well-developed and efficient at all relevant times. As a result of these materially false and materially misleading statements and failures to disclose, Ashanti shares traded at artificially inflated prices during the Class Period. The artificial inflation continued until the time Ashanti admitted that its "hedge" portfolio had turned negative and the Company would be required to meet substantial margin calls and these admissions were communicated to, and/or digested by, the securities markets. Plaintiffs and other members of the Class purchased or otherwise acquired Ashanti common stock relying upon the integrity of the market price of Ashanti common stock and market information relating to Ashanti, and have been damaged thereby.

59.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Ashanti common stock, by publicly issuing materially false and misleading statements and omitting material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they misrepresented the activities of the Company, its business and operations, including, inter alia:

(a)     that the Company knew the terms of its derivatives transactions and was fully capable of analyzing the effects of rapidly rising gold prices and rising implied volatility whereas in fact Ashanti had no such capabilities.

(b)     that the Company's "strategic aim" was to "maintain a high level of protection" as the increase in the Company's "hedge" book was not solely related to protecting the Company against fluctuations in the price of gold but rather was to a dangerous degree a "reckless" bet that the price of gold would fall, and an attempt to generate revenue for the company;

(c)     that the reported mark-to-market value of the Company's "hedge" book, $290 million, was materially misleading as it failed to state Ashanti's extreme sensitivity to gold volatility or sudden price movements, an eventuality against which the "hedge" book was supposed to protect;

(d)     it was not true that the Company had eliminated any exposure to floating lease rates as the Company's "hedge" book had been materially negatively impacted by floating lease rates; and

Said statements also concealed and omitted material adverse information including, <u>inter alia</u>:

(e)     that the Company was employing option contracts to increase income which option contracts assumed enormous risk in its "hedge" book and these contracts exposed the Company to insurmountable liabilities should the price of gold rise or become volatile;

(f)     that the increase in the Company's "hedge" position could expose the Company to substantial margin calls should the price of gold rise or become volatile and that the Company lacked the cash to meet those margin calls should that scenario arise.  In other words, the Company had increased the risks enormously in its "hedge" position and taken the undisclosed risk that it would find itself unable to meet the obligations it had assumed;

(g)     that the terms of the options contracts in the Company's "hedge" book, including the strike prices and margin call requirements, were such that the Company could (and did) suffer extreme losses and margin call requirements when gold prices rose or became more volatile;

(h)     the rising gold price had caused the Company's "hedge" book to have a negative value such that the Company would be required to meet substantial margin calls which the Company would be unable to do;

(i)     the mark-to-market value of the Company's "hedge" book was as low as negative $570 million (on October 9, 1999);

(j)     given the foregoing, defendants' estimates, projections and opinions as to the Company's operations, earnings and income were knowingly or recklessly lacking in reasonable basis at all relevant times.

31

60.     At all relevant times, the material misrepresentations and omissions particularized

in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by plaintiffs and other members of the Class.  As described herein, during the

Class Period, defendants made or caused to be made a series of materially false or misleading

statements about Ashanti's business, prospects and operations.  These material misstatements

and omissions had the cause and effect of creating in the market an unrealistically positive

assessment of Ashanti and its business, prospects and operations, thus causing the Company's

common stock to be overvalued and artificially inflated at all relevant times.  Defendants'

materially false and misleading statements during the Class Period resulted in plaintiffs and other

members of the Class purchasing the Company's common stock at artificially inflated prices,

thus causing the damages complained of herein.

## SCIENTER ALLEGATIONS

61.     Because of their executive and managerial positions with Ashanti, each of the

Individual Defendants had access to the material adverse non-public information about the

business, finances, markets and present and future business prospects of Ashanti particularized

herein via access to internal corporate documents, conversations or connections with corporate

officers or employees, attendance at management and/or Board of Directors' meetings and

committees thereof and/or via reports and other information provided to them in connection

therewith.

62.     Defendants had a duty to promptly disseminate accurate and truthful information

with respect to Ashanti's operations and financial condition or to cause and direct that such

information be disseminated and to promptly correct any previously disseminated information

that was misleading to the market.  As a result of their failure to do so, the price of Ashanti

shares was artificially inflated during the Class Period, damaging plaintiffs and the Class.

63.     The Individual Defendants, because of their positions with Ashanti, controlled the contents of quarterly and annual reports, press releases and presentations to securities analysts. Each Individual Defendant was provided with copies of the reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not the public, each of these defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Ashanti's corporate releases detailed herein as "group-published" information and is therefore responsible and liable for the representations contained therein.

64.     Each of the defendants is liable as a primary violator in making these materially false and misleading statements, and for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Ashanti shares during the Class Period. All of the defendants had motives to pursue a fraudulent scheme in furtherance of their common goal, i.e., inflating the reported profits of Ashanti and the trading price of Ashanti shares by making false and misleading statements and concealing material adverse information. The fraudulent scheme and course of business was designed to and did: (i) deceive the investing public, including plaintiffs and other Class members; (ii) artificially inflate the price of Ashanti shares during the Class Period; (iii) cause plaintiffs and other members of the Class to purchase Ashanti shares at inflated prices; and (iv) conceal and coverup the Individual Defendants' mismanagement of Ashanti.

65.     Since volatility is a fundamental factor in the equation to determine the value of an option, defendants had to have calculated and tracked the volatility in the price of gold in

order to be able to make any representation about the value of the purported "hedge" book. If they did not, then defendants were reckless in making statements about the value of the "hedge" book by failing to account for the volatility of the options in the purported "hedge" book.

66.    Defendant Keatley, in the July 28, 1999 investor conference call, demonstrated that Ashanti knew the terms of its derivatives transactions and was fully capable of stating the effects of rising implied volatility as present facts:

> At a gold price of $325 an ounce, which is $65 dollars an ounce higher than — well, let's say, $70 an ounce higher than today's level, the mark to market would be negative, but it would be within, well, within the levels of margin calls which we've negotiated with our counter parties. We have some $350 million of credit available from our counterparties in the form of mark to market limits. I guess, I'm sure you're aware, in asking that question, that that's, that's a severe stress test to subject a portfolio to, and it's in, some ways, an unrealistic one because — these increases typically do not happen in one day, on that order of magnitude. But I agree with you that this is an appropriate question to ask because it's one we do ourselves every week. We want to make sure we can withstand, you know, even a very rapid, very sudden, big increase in the price.
>
> Now, the profile of the mark to market is that these trades accrete value over time in a way that is more than linear. The recent trade will show, will not show any significant mark to market at this time. But with the passage of time, if there's no change in the gold price, those will accrue value, rapidly. So, if we did no change to our portfolio, six months from now, the sensitivity to the gold price would be, would be much less that what I've indicated today.

In the same conference call, Keatley also stated that Ashanti conducted a weekly "sensitivity analysis" which served to calculate what would happen to the derivatives book if gold prices rose to certain levels. Similarly, in the April 1999 investor conference call Keatley asserted that Ashanti was capable of and was conducting sensitivity analyses of Ashanti's derivatives if gold prices rose to $350 per ounce.

34

67.     Defendants, in their 1996 20-F and 1997 20-F, each described the volatility of the gold market and assumed responsibility for the Company's hedging activities, which they characterized as a Board decision subject to internal controls:

### Hedging Activities

The Company's revenues are strongly influenced by the world gold price, which fluctuates widely and over which the Company has no control.  The Company pursues a hedging strategy designed both to protect the Company's cashflow and ensure its continued ability to conduct its business and service its obligations in the event that the gold price falls and to allow the Company to participate in upward appreciation or any rallies in the gold price.  The overall sales and hedging strategy is set by the Board of Directors of the Company at its quarterly meetings and continuing hedging operations are subject to strict internal controls.  The controls currently in place over the Company's hedging operation include the separation of the trading and settlement functions and the requirements that each individual hedging transaction be approved by a member of the Board.

68.     Defendants further maintained, at all relevant times, that the market for gold was highly volatile.  In its 1998 20-F, the Company described the historic volatility of the gold market that makes hedging necessary:

### Gold Price Volatility

The Company's profitability and ability to pay dividends and undertake capital expenditure is significantly affected by changes in the market price of gold.  Historically, gold prices have fluctuated widely and are affected by numerous industry factors, such as demand for precious metals, forward selling by producers, sales and purchases of gold by central banks, and production and cost levels in major gold-producing regions such as South Africa, Australia, the U.S.A. and the countries of the former Soviet Union.  Moreover, gold prices are also affected by macro-economic factors such as expectations for inflation, interest rates, currency exchange rates and global or regional political and economic situations.  Gold prices are also affected by worldwide production levels, which have increased in recent years.

A table accompanying this discussion showed the wide movement in gold prices since 1985, from a high of US$500 in 1987 to a low of US$273 in 1998.  Gold prices also fluctuated — by as

much as US$112 — within each calendar year throughout that period, with average yearly prices hovering in the mid-to-high US$300s. Defendants therefore knew both that gold prices could move substantially either up or down within a short period of time, and that gold, in the prior decade, had averaged annually in the US$ 340-350 range. Nonetheless, undisclosed to investors, defendants bet most of the value of the Company against gold price volatility.

69.     Individual Defendant Mark B. Keatley signed many or all of the public filings made with the SEC during the relevant time period. For example, he signed the 1996, 1997, and 1998 Forms 20-F.

70.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company, were materially false and misleading; knew or recklessly disregarded that such materially false and misleading statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Ashanti and its business practices, their control over and/or receipt of Ashanti's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Ashanti were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

71.     The Individual Defendants engaged in such a scheme to inflate the price of

Ashanti common stock in order to: (i) protect and enhance their executive positions and the

substantial compensation and prestige they obtained thereby; and (ii) enhance the value of their

personal holdings of Ashanti common stock.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

72.     At all relevant times, the market for Ashanti common stock was an efficient

market for the following reasons, among others:

(a)     Ashanti common stock met the requirements for listing, and was listed and
        actively traded, on the NYSE, a highly efficient market;

(b)     During the Class Period millions of shares of Ashanti common stock were traded;

(c)     As a regulated issuer, Ashanti filed periodic public reports with the SEC and the
        NASD;

(d)     Ashanti stock was followed by securities analysts employed by major brokerage
        firms, including ABN AMRO, Canaccord Capital Corp., Dresdner Kleinwort
        Benson, Fleming Martin, Goldman Sachs, Griffiths McBurney Partners, HSBC
        Securities, Merrill Lynch, Nesbitt Burns, Paribas, RBC Dominion Securities,
        Robert Fleming Securities, SG Securities, Schroder Securities, Scotia Capital,
        Warburg Dillon Read, CIBC World Markets Corp., Investec Securities, Lehman
        Brothers, and Deutsche Bank, who wrote reports which were distributed to the
        sales force and certain customers of their respective brokerage firms.  Each of
        these reports was publicly available and entered the public marketplace.

(e)     Ashanti regularly issued press releases which were carried by national newswires.
        Each of these releases was publicly available and entered the public marketplace.

73.     As a result, the market for Ashanti securities promptly digested current

information with respect to Ashanti from all publicly-available sources and reflected such

information in Ashanti's stock price.  Under these circumstances, all purchasers of Ashanti

common stock during the Class Period suffered similar injury through their purchase of stock at

artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

74.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired the Global Depositary Receipts of Ashanti Goldfields Company Limited listed on stock exchanges in the United States during the period between April 21, 1997 and October 5, 1999, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are the defendants herein, members of each Individual Defendant's immediate family, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

75.    Because Ashanti had approximately 100 million shares outstanding, and because the Company's shares were openly and actively traded during the Class Period on the New York Stock Exchange, members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members can only be determined by appropriate discovery, plaintiffs believe that Class members number at least in the thousands and that they are geographically dispersed.  During the Class Period, tens of thousands of Ashanti shares traded daily.

76.    Plaintiffs' claims are typical of the claims of the members of the Class, because plaintiffs and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

77.    Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel who are experienced and competent in class and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with the members of the Class plaintiffs seek to represent.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

79.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether the Company's publicly disseminated releases and statements during the Class Period omitted and/or misrepresented material facts and whether defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(c)     whether defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(d)     whether the defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

(e)     whether the market prices of Ashanti shares during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(B) OF THE
### 1934 ACT AND RULE 10B-5 PROMULGATED
### THEREUNDER AGAINST ALL DEFENDANTS

80.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against all defendants.

81.     During the Class Period, defendants Ashanti and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ashanti common stock; and (iii) cause plaintiffs and other members of the Class to purchase Ashanti stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants Ashanti and the Individual Defendants, and each of them, took the actions set forth herein.

82.     These defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Ashanti common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Ashanti, as alleged below.

83.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate

40

truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

84.     Ashanti and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Ashanti as specified herein.  These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Ashanti's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Ashanti and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Ashanti securities during the Class Period.

85.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and

director of the Company, was privy to and participated in the creation, development and

reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the Individual

Defendants enjoyed significant personal contact and familiarity with each other and were advised

of and had access to other members of the Company's management team, internal reports, and

other data and information about the Company's financial condition and performance at all

relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination

of information to the investing public which they knew or recklessly disregarded was materially

false and misleading.

86.     These defendants had actual knowledge of the misrepresentations and omissions

of material facts set forth herein, or acted with reckless disregard for the truth in that they failed

to ascertain and to disclose such facts, even though such facts were readily available to them.

Such defendants' material misrepresentations and/or omissions were done knowingly or

recklessly and for the purpose and effect of concealing Ashanti's operating condition, business

practices and future business prospects from the investing public and supporting the artificially

inflated price of its stock. As demonstrated by their overstatements and misstatements of the

Company's financial condition and performance throughout the Class Period, the Individual

Defendants, if they did not have actual knowledge of the misrepresentations and omissions

alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking

those steps necessary to discover whether those statements were false or misleading.

87.     As a result of the dissemination of the materially false and misleading information

and failure to disclose material facts, as set forth above, the market price of Ashanti's common

stock was artificially inflated during the Class Period. In ignorance of the fact that the market

price of Ashanti's shares was artificially inflated, and relying directly or indirectly on the false

and misleading statements made by defendants, or upon the integrity of the market in which the

securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Ashanti common stock during the Class Period at artificially inflated high prices and were damaged thereby.

88.     At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had plaintiffs and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Ashanti, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Ashanti securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

89.     By virtue of the foregoing, Ashanti and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

90.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### COUNT II

### FOR VIOLATIONS OF SECTION 20(A) OF THE
### 1934 ACT AGAINST INDIVIDUAL DEFENDANTS

91.     Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

92.     The Individual Defendants were and acted as controlling persons of Ashanti within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's

43

operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.  Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

93.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

94.     As set forth above, Ashanti and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## BASIS OF ALLEGATIONS

95.     This complaint is pleaded in conformance with Federal Rules of Civil Procedure and the PSLRA.  Plaintiffs have alleged the foregoing based upon, among other things, the investigation of plaintiffs' counsel, which included a review of Ashanti's SEC filings, securities analysts' reports and advisories about the Company, press releases issued by the Company and media reports about the Company.

**CAULEY & GELLER**

By: _Allen Carney /Cau_

Steven E. Cauley
Allen Carney
11311 Arcade Drive, Suite 201
Little Rock, AR  72212
(501) 312-8500

**Co-Lead Counsel for Plaintiffs
and the Class**